SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
      1200 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0721
      Facsimile: (213) 894-0141
      E-mail:    John.Lulejian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>BANI SOLORZANO,<br><br>A Fugitive from the Government of the Canada. | No. 17-02667 M<br><br>AMENDED REDACTED COMPLAINT FOR ARREST WARRANT AND EXTRADITION |

On October 26, 2017, the United States, acting in accordance with the Treaty obligations to the Government of Canada, filed its Complaint for Arrest Warrant and Extradition of BANI SOLORZANO, along with the formal papers (with seals and ribbons) supporting that request for extradition, as required by the Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983; Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-17 (1990); and Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002). (See Docket No. 1.)

The government filed the Complaint, the declaration from the United States Department of State, and the diplomatic note formally

1  requesting the extradition (Exhibit A; yellow ribbon) and the

2  redacted documentary evidence accompanying the request for

3  extradition (Exhibit B; red ribbon), received by the United States

4  from the Government of Canada, under seal, to comply with the privacy

5  requirements of Federal Rule of Civil Procedure 5.2, and to the

6  extent applicable, Federal Rule of Criminal Procedure 49.1.  On

7  November 7, 2017, the government filed redacted copies of the

8  Complaint and these documents for the public record.  (See Docket

9  No. 13.)

10      The government hereby files amended redacted copies of these

11  documents to ensure further that it has complied with the relevant

12  privacy requirements.  See Fed. R. Civ. P. 5.2(d); Fed. R. Crim.

13  P. 49.1(d).

14

15  DATED:  November 28, 2017        Respectfully submitted,

16                                   SANDRA R. BROWN
                                     Acting United States Attorney
17
                                     LAWRENCE S. MIDDLETON
18                                   Assistant United States Attorney
                                     Chief, Criminal Division
19

20                                   /s John J. Lulejian
                                     JOHN J. LULEJIAN
21                                   Assistant United States Attorney

22                                   Attorneys for Complainant
                                     UNITED STATES OF AMERICA
23

24

25

26

27

28

```
1   SANDRA R. BROWN
    Acting United States Attorney
2   LAWRENCE S. MIDDLETON
    Assistant United States Attorney
3   Chief, Criminal Division
    JOHN J. LULEJIAN (Cal. Bar No. 186783)
4   Assistant United States Attorney
          1200 United States Courthouse
5         312 North Spring Street
          Los Angeles, California 90012
6         Telephone: (213) 894-0721
          Facsimile: (213) 894-0141
7         E-mail:   John.Lulejian@usdoj.gov

8   Attorneys for Plaintiff
    UNITED STATES OF AMERICA
9
```

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 6 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>BANI SOLORZANO,<br><br>A Fugitive from the Government of Canada. | No.<br><br>COMPLAINT 17 MJ 02667<br><br>FOR ARREST WARRANT AND EXTRADITION; ORDER THEREON<br><br>**(UNDER SEAL)** |

17   TO:   Honorable Jean P. Rosenbluth
            United States Magistrate Judge
18          Central District of California

19         I, JOHN J. LULEJIAN, being duly sworn, depose and state that I

20   am an Assistant United States Attorney for the Central District of

21   California and act for the United States in fulfilling its

22   obligations to the Government of the Canada pursuant to the Treaty on

23   Extradition Between the United States of America and Canada, U.S.-

24   Can., Dec. 3, 1971, 27 U.S.T. 983; Protocol Amending the Extradition

25   Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-

26   17 (1990); and Second Protocol Amending the Extradition Treaty with

27   Canada, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002)

28

1   (collectively the "Extradition Treaty"), with respect to the

2   fugitive, BANI SOLORZANO ("SOLORZANO").

3       In accordance with Title 18, United States Code, Section 3184, I

4   charge on information and belief as follows:

5       1.  That pursuant to the Treaty, the Government of Canada has

6   submitted a formal request through diplomatic channels for the

7   extradition of SOLORZANO, a Guatemalan national.  Attached hereto is

8   the declaration from the United States Department of State and the

9   diplomatic note formally requesting the extradition (Exhibit 1;

10  yellow ribbon) and the documentary evidence accompanying the Request

11  for Extradition (Exhibit 2; red ribbon), received by the United

12  States from Canada.

13      2.  That I am informed through diplomatic channels that

14  SOLORZANO is wanted to stand trial in Canada for the following

15  charges:  (1) sexual interference, in violation of section 151 of the

16  Criminal Code of Canada ("CCC"); (2) invitation to sexual touching,

17  in violation of section 152 of the CCC; and (3) sexual assault, in

18  violation of section 271 of the CCC.  SOLORZANO is alleged to have

19  committed these offenses within the Province of Alberta, Canada,

20  between or about June 1, 2010, and October 31, 2010.  Accordingly, on

21  March 1, 2012, at Edmonton, Alberta, a detective with the Edmonton

22  Police Service swore out an Information before Justice of the Peace

23  Ian Zaharko.  On that same day, Justice of the Peace Zaharko also

24  issued an arrest warrant for SOLORZANO.  The government of Canada

25  represents that the warrant is of full force and effect in Alberta,

26  Canada.

27      3.  That the offenses for which SOLORZANO's extradition is

28  sought are covered by Article 2 of the Extradition Treaty.

2

4.    That the extradition request contains a prosecutor's statement, a police officer's statement, and court documents, including an arrest warrant, copies of which are attached hereto as part of Exhibit 1, from which the following facts may reasonably be derived:

a.    On March 23, 2011, a detective with the Edmonton Police Service conducted a video- and audio-recorded interview of the mother of E.S., the victim in this case, who related the following:

i.    In June 2010, E.S., who was then eleven years old, and her family began sharing a residence with her aunt's family in Edmonton, Alberta. SOLORZANO, who was 22-years old at the time, was a member of the household.

ii.    On March 16, 2011, E.S.'s mother reported to the police that in October 2010, she and her sister (E.S.'s aunt) discovered that SOLORZANO had been sexually assaulting E.S. during the previous months. E.S.'s mother learned of the assaults when E.S.'s aunt discovered her niece (E.S.) trying to wash bloodstains from her underwear. When her E.S.'s mother confronted her about the underwear, E.S. disclosed that SOLORZANO had digitally penetrated her vagina, that she had masturbated his penis, and that there had been one incident of vaginal intercourse. That same day, E.S.'s mother observed a bloodstain on SOLORZANO's bedspread.

iii. On that same day in October 2010, E.S.'s mother and aunt confronted SOLORZANO about sexual activity between him and E.S. SOLORZANO replied, "I messed up again."

iv.    E.S.'s mother explained that she delayed reporting the assaults because she was afraid that Child Services

1  would take away her children.   When she learned that this was not the
2  case, E.S.'s mother reported the incidents to the police.

3      b.   On March 23, 2011, the above detective conducted a
4  video- and audio-recorded interview of E.S., who related the
5  following:

6      i.   On four or five occasions SOLORZANO took E.S.'s
7  hand, placed it on his penis and then had her move her hand up and
8  down; he placed his finger in her vagina "a lot" of times; and on one
9  occasion he put his penis in her vagina.   E.S was uncertain about the
10  exact dates but said the incidents took place while her family was
11  living with SOLORZANO's family, in a bedroom that SOLORZANO shared
12  with his two brothers and E.S.'s two brothers.

13      ii.   The incidents took place when E.S. came into the
14  bedroom to play games on SOLORZANO's iPhone, as SOLORZANO played
15  video games on the PlayStation kept in the room.   SOLORZANO would
16  then come onto the bed, ask what she was doing, and touch her
17  sexually.

18      c.   On March 23, 2011, the above detective conducted a
19  video- and audio-recorded interview of E.S.'s brother (then 14years
20  old), who related that in the fall of 2010, SOLORZANO admitted he had
21  "fucked up" because of what he did to E.S.   When E.S.'s brother asked
22  what SOLORZANO meant, SOLORZANO said, "I kinda raped your sister.   I
23  wish you could punch me for what I did."

24      d.   On March 28, 2011, a pediatrician conducted a medical
25  examination of E.S. and determined that the examination was normal
26  and showed "no evidence of previous penetrating trauma."   The
27  pediatrician opined that a normal examination is not inconsistent
28  with sexual abuse.

4

1       e.   On June 15, 2011, E.S.'s mother forwarded to the
2  police an e-mail she received four days earlier from
3  banisolorzano@rocketmail.com, an e-mail account that she understood
4  that SOLORZANO used, with the subject line "Please read this." The
5  e-mail included the following passage:

> [M]y father just told me this morning about you informing
> the whole family about the incident that happen [sic] last
> year. I'm not mad at you at all and I know I probably
> deserve it or I might have not, but I don't want to debate
> on this so I'll drop it. All I want to know is why? I know
> i [sic] stuck you in the most delicate spot ever and there
> are no words that can describe it. Not a day goes by that I
> don't think about the pain I caused you so deeply,
> seriously though, bullshit to the side. I can't make you
> keep your mouth shut about this because it's your daughter,
> but I would like to ask you kindly to not talk about it to
> no one. This only affects you and me more and [E.S.]. I
> have cause [sic] enough damage and now since everyone
> knows, the pain will grow bigger. I know what I put you
> through and I'm really sorry. There are days when I just
> get in a mood that no one can stand me and that's because
> I'm thinking of the pain I caused you. If you were the type
> of person once [sic] can talk to freely I would, but I see
> I can't.

25       f.   On July 26, 2017, another detective from Edmonton
26  Police Service showed E.S. a photograph of SOLORZANO that the police
27  obtained from Instagram. E.S. positively identified the person in

28

the photograph as her cousin, SOLORZANO.  A copy of this photograph
is included as an exhibit to Canada's extradition request.

g.   The age of consent in Canada is 16 years of age.

h.   SOLORZANO is a Guatemalan national by birth.  He does
not have legal status in either the United States or Canada.
Nonetheless, he has a California driver's license (No. ****4081),
with a Palmdale, California address and a year of birth of 1988.

i.   According to the prosecutor, there is no statutory
limitation period of general application in respect to the charged
offenses against SOLORZANO.

5.   That I am informed and believe that the fugitive may be
found in this district, placing him within the jurisdiction of this
Court.  According to the United States Marshals Service ("USMS"),
SOLORZANO is in custody at the Theo Lacey Detention Facility in
Orange, California pursuant to an immigration hold.

6.   That I am informed and believe that the USMS fugitive task
force identified SOLORZANO by comparing a copy of his California
driver's license (No. ****4081) photograph and the one the Edmonton
Police Service showed to E.S. to the person they arrested.  They
determined that the person in custody was the same person depicted in
the two photographs.  In addition, SOLORZANO's fingerprints taken
following his arrest positively matched a set of fingerprints
associated with him in law enforcement databases.

7.   That Katherine C. Fennell, an attorney in the Office of the
Legal Adviser of the United States Department of State, has provided
the United States Department of Justice with a declaration attaching
a copy of the Extradition Treaty, authenticating a copy of the
diplomatic note by which the request for extradition was made,

1   stating that the offenses for which extradition is requested are
2   covered by the Extradition Treaty, and confirming that the documents
3   supporting the request for extradition are properly certified by the
4   Charge d'Affaires in Canada, in accordance with Title 18,
5   United States Code, Section 3190, so as to enable them to be received
6   in evidence.

7       WHEREUPON, complainant requests that a warrant be issued, based
8   on probable cause, pursuant to Title 18, United States Code, Section
9   3184, for the arrest of SOLORZANO; that SOLORZANO be brought before
10  this Court to the end that the evidence of criminality heard and
11  considered; that if on such hearing this Court deems the evidence
12  sufficient to sustain the charge under the provisions of the
13  Extradition Treaty, the Court certify the same to the Secretary of
14  State in order that a warrant may issue for the surrender of
15  SOLORZANO to the appropriate authorities of the requesting state,
16  Canada, according to the Extradition Treaty; and that this Court take
17  such other actions as this Court is required to

18  \\
19  \\
20  \\
21  \\
22  \\
23  \\
24  \\
25  \\
26  \\
27  \\
28  \\

7

take under the provisions of the Extradition Treaty and the laws of the United States to meet the obligations of the Extradition Treaty.

DATED: This __26th__ day of October, 2017, at Los Angeles, California.

Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

__/s/__
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Complainant
UNITED STATES OF AMERICA

Subscribed and sworn to before me this ___ day of October, 2017.

**JEAN P. ROSENBLUTH**

UNITED STATES MAGISTRATE JUDGE

**JEAN P. ROSENBLUTH**

# EXHIBIT 1

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF KATHERINE C. FENNELL

I, Katherine C. Fennell, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am charged with the extradition case of Bani Solorzano. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaty in full force and effect between the United States and Canada, the Canadian Embassy has submitted Diplomatic Note No. 4816, dated September 13, 2017, formally requesting the extradition of Bani Solorzano. A copy of the Diplomatic Note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and Canada are found in the Extradition Treaty between the United States of America and Canada of December 3, 1971, which entered into force on March 22, 1976 (TIAS 8237) (the "1971 Treaty"), the Protocol Amending the Extradition Treaty with Canada of January 11, 1988, which entered into force on November 26, 1991 (the "1988 Protocol"), and the Second Protocol Amending the Extradition Treaty with Canada of January 12, 2001, which entered into force on April 30, 2003 (the "2001 Protocol"). Copies of the Treaty and the Protocols are attached to this declaration.

4. In accordance with Article 17 of the 1971 Treaty, the Government of the United States provides legal representation in its courts for Canada in its extradition requests, and Canada provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are extraditable offenses pursuant to Article 2 of the 1971 Treaty, as replaced by Article I of the 1988 Protocol.

18002950-1

# United States of America



## DEPARTMENT OF STATE

## *To all to whom these presents shall come, Greetings:*

...tify That Katherine C. Fennell, whose name is subscribed to the document hereunto annexed,
a...  e time of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of
at...  ited States of America, and that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Rex W. Tillerson, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this nineteenth day of October, 2017.

*Rex W. Tillerson*

Secretary of State

By *Matthews*

Assistant Authentication Officer,
Department of State

*Is...   rsuant to CHX...   e of
Se...   1789, 1 Stat. ...   22
US...   7; 22USC 2651 ...   ISC
30...   ISC 1733 et. se...   ISC
14...   RULE 44 Federa...  ; of
Ci...   edure.*

-2-

6. Documents submitted by the Government of Canada in support of its extradition request were certified on September 8, 2017, by Elizabeth Moore Aubin, Chargé d' Affaires of the United States of America in Ottawa, in accordance with Title 18, United States Code, Section 3190.  Ms. Aubin, at the time of her certification, was the principal diplomatic officer of the United States in Canada.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October ____19____, 2017.

KATHERINE C. FENNELL

Attachments:

1.  Copy of the Note
2.  Copies of Treaty and Protocols



**Canadian Embassy**          **Ambassade du Canada**

Note No. 4816

The Embassy of Canada presents its compliments to the Department of State and has the honour to request the extradition of Bani Solorzano a Guatemalan citizen, with no status in Canada born on ████████ 1988.

Photograph of the person sought is appended to the supporting extradition documents.

Canada is seeking the extradition of Bani Solorzano to stand trial for the alleged offences of:

(a) sexual interference, contrary to s. 151 of the *Criminal Code*;

(b) invitation to sexual touching, contrary to s. 152 of the *Criminal Code*; and

(c) sexual assault, contrary to s. 271 of the *Criminal Code*;

The charges above against Mr. Bani SOLORZANO stem from a series of incidents between June and October, 2010, involving SOLORZANO and his female cousin, E.S., then eleven years old. A mandatory publication ban on E.S.'s name and identity will be applied for under section 486.4 of the *Criminal Code* when these charges are brought into court. The incidents took place in the City of Edmonton, in the Province of Alberta, Canada.

Information Number 120246186P1 was sworn before Justice of the Peace Ian Zaharko, on March 1st, 2012.

Warrant for Arrest was sworn before Justice of the Peace Ian Zaharko, on March 1st, 2012. There is no statute of limitations in respect of the offences for which the person sought stands charged. The offences are punishable by more than one year of imprisonment.

As per his California driver's licence, Mr. Solorzano is believed to be residing at: ███████████ Palmdale, CA 93550.

The Prosecuting Attorney is Matthew W. Griener, Crown Prosecutor, Alberta Justice and Solicitor General, telephone 780-638-3364.

The Embassy of Canada avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.



WASHINGTON, D.C.

September 13, 2017

| 107TH CONGRESS<br>2d Session | SENATE | TREATY DOC.<br>107–11 |
| --- | --- | --- |

# SECOND PROTOCOL AMENDING EXTRADITION TREATY WITH CANADA

---

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OTTAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2002

99–118

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

# LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United states of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

VI

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

VII

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular officer of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

VIII

be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

Respectfully submitted,

COLIN L. POWELL.

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them,
reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;
and

DESIRING to make more effective the Extradition Treaty between the Parties,
signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as
amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the
Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988
(hereinafter "the Protocol");

HAVE AGREED as follows:

## ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance
with the Extradition Treaty, may temporarily surrender a person who has been
convicted and sentenced in the requested State, in order that the person sought may be
prosecuted in the requesting State. The temporary surrender of the person shall not
divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus
application relating to the conviction or sentence that otherwise may be available under
the laws of the requested State.

(1)

2

2.     A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.     The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.     : When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender.  A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.     Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.     Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.     Final surrender shall not take place when:

   (a)     the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

   (b)     after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

## ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

   (a)     in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

3

(b)   in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)   they are certified or authenticated in any other manner accepted by the law of the requested State."

### ARTICLE 3

1.   This Second Protocol shall form an integral part of the Extradition Treaty.

2.   Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.   This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification. It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at Ottawa this Twelfth day of January 2001 in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

FOR THE GOVERNMENT
OF CANADA

| 101ST CONGRESS 2d Session | SENATE | TREATY DOC. 101–17 |
|---|---|---|

# PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974



APRIL 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

39–118                           WASHINGTON : 1990

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 24, 1990.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on Extradition Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current extradition treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, *inter alia,* parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 10, 1990.*

The PRESIDENT,
*The White House:*

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 Extradition Treaty Between the United States of America and Canada signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974 (27 U.S.T. 983; TIAS 8237). The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 Extradition Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current Extradition Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes extradition based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits extradition for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request extradition for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises

2

even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and Canada are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) (22 U.S.T. 1641; TIAS 7192) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention) (24 U.S.T. 564; TIAS 7570).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and Canada have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 (28 U.S.T. 1975; TIAS 8532); and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 Extradition Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

3

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. extradition treaties. The extension will allow prosecutors greater latitude in assembling extradition packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters, dated January 11, 1988, which restates that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 Extradition Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,
*Washington, January 11, 1988.*

Hon. JOE CLARK, P.C., M.P.,
*Secretary of State for External Affairs of Canada, Ottawa.*

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on Extradition between the United States and Canada we signed today and have the honor to address to you the following.

The United States and Canada recognize that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-Canada Extradition Treaty.

Where a person has been charged with or convicted of such an offense in Canada and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence extradition proceedings against such a person pursuant to the Treaty in order that the person may be returned to Canada.

4

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

Canada and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

Canada and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of Canada for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to Canada and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of extradition proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

OTTAWA, *January 11, 1988.*

JLA–0026.

Hon. GEORGE P. SHULTZ,
*Secretary of State of the United States of America.*

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters." I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

## ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

## "ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

## ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

## ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

(5)

6

authority in the requested State may, in its discretion, grant extradition."

## Article IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## Article V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

## Article 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## Article VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## Article VII

The Extradition Treaty is amended by adding the following after Article 17:

7

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

O



TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

[Reprint of English text only]

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
*    the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
*    cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
*    May 6, 1976;*
*Entered into force March 22, 1976.*

---

## BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

(1)                                        TIAS 8237

2 

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

[SEAL]

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

3

### TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA

The United States of America and Canada, desiring to make more effective the cooperation of the two countries in the repression of crime by making provision for the reciprocal extradition of offenders, agree as follows:

TIAB 8237

4

### ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

### ARTICLE 2

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2) Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3) Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

### ARTICLE 3

(1) For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space

TIAS 8237

5

and territorial waters and vessels and aircraft registered in
that Contracting Party or aircraft leased without crew to a lessee
who has his principal place of business, or, if the lessee has
no such place of business, his permanent residence in, that
Contracting Party if any such aircraft is in flight, or if any
such vessel is on the high seas when the offense is committed.
For the purposes of this Treaty an aircraft shall be considered
in flight from the moment when power is applied for the purpose
of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is
committed on board an aircraft at any time from the moment when
all its external doors are closed following embarkation until
the moment when any such door is opened for disembarkation, such
offense and any other offense covered by Article 2 committed
against passengers or crew of that aircraft in connection with
such offense shall be considered to have been committed within
the territory of a Contracting Party if the aircraft was
registered in that Contracting Party, if the aircraft landed in
the territory of that Contracting Party with the alleged offender
still on board, or if the aircraft was leased without crew to a
lessee who has his principal place of business, or, if the lessee
has no such place of business, his permanent residence in that
Contracting Party.

(3)  When the offense for which extradition has been requested
has been committed outside the territory of the requesting State,
the executive or other appropriate authority of the requested
State shall have the power to grant the extradition if the laws
of the requested State provide for jurisdiction over such an
offense committed in similar circumstances.

6

## ARTICLE 4

(1)  Extradition shall not be granted in any of the following circumstances:

(i)  When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character.  If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed on board an aircraft engaged in commercial services carrying passengers.

TIAS 8237

7

## ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

8

ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

ARTICLE 9

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

9

## ARTICLE 10

(1) Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2) The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

## ARTICLE 11

(1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

## ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii)  He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii)  The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

11

## ARTICLE 13

(1) A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2) Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

## ARTICLE 14

(1) The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2) If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

## ARTICLE 15

(1) To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

12

(2)  Subject to the qualifications of paragraph (1) of this
Article, the above-mentioned articles shall be returned to the
requesting State even if the extradition, having been agreed to,
cannot be carried out owing to the death or escape of the person
sought.

## ARTICLE 16

(1)  The right to transport through the territory of one of
the Contracting Parties a person surrendered to the other
Contracting Party by a third State shall be granted on request
made through the diplomatic channel, provided that conditions
are present which would warrant extradition of such person by the
State of transit and reasons of public order are not opposed to
the transit.

(2)  The Party to which the person has been extradited shall
reimburse the Party through whose territory such person is
transported for any expenses incurred by the latter in connection
with such transportation.

## ARTICLE 17

(1)  Expenses related to the transportation of the person
sought to the requesting State shall be paid by the requesting
State.  The appropriate legal officers of the State in which the
extradition proceedings take place shall, by all legal means
within their power, assist the requesting State before the
respective judges and magistrates.

13

(2)   No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

## ARTICLE 18

(1)   This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)   This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)   This Treaty shall enter into force upon the exchange of ratifications.[1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

---

[1] Mar. 22, 1976.

14

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

FOR THE UNITED STATES OF AMERICA:

[1]

FOR CANADA:

[1]

[1] William P. Rogers
[1] Mitchell Sharp

15

### SCHEDULE

1. Murder; assault with intent to commit murder.

2. Manslaughter.

3. Wounding; maiming; or assault occasioning bodily harm.

4. Unlawful throwing or application of any corrosive substances at or upon the person of another.

5. Rape; indecent assault.

6. Unlawful sexual acts with or upon children under the age specified by the laws of both the requesting and requested States.

7. Willful nonsupport or willful abandonment of a minor when such minor is or is likely to be injured or his life is or is likely to be endangered.

8. Kidnapping; child stealing; abduction; false imprisonment.

9. Robbery; assault with intent to steal.

10. Burglary; housebreaking.

11. Larceny, theft or embezzlement.

12. Obtaining property, money or valuable securities by false pretenses or by threat of force or by defrauding the public or any person by deceit or falsehood or other fraudulent means, whether such deceit or falsehood or any fraudulent means would or would not amount to a false pretense.

13. Bribery, including soliciting, offering and accepting.

14. Extortion.

TIAS 8237

16

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

17

27. Use of the mails or other means of communication in
connection with schemes devised or intended to deceive
or defraud the public or for the purpose of obtaining
money or property by false pretenses.

28. Offenses against federal laws relating to the sale or
purchase of securities.

29. Making or having in possession any explosive substance
with intent to endanger life, or to cause severe damage
to property.

30. Obstructing the course of justice in a judicial
proceeding, existing or proposed, by:

a)  dissuading or attempting to dissuade a person by
threats, bribes, or other corrupt means from
giving evidence;

b)  influencing or attempting to influence by threat,
bribes, or other corrupt means a person in his
conduct as a juror; or

c)  accepting a bribe or other corrupt consideration
to abstain from giving evidence or to do or to
refrain from doing anything as a juror.

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*

Canadian Embassy          Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

I have the honour to refer to the Treaty on Extra-
dition between the Government of Canada and the Government
of the United States signed at Washington on December 3,
1971 and to subsequent discussions between representatives
of our two governments concerning the amendment of the said
Treaty.

Further to those discussions I now have the honour
to propose that the said Treaty be amended as follows:

(1) That Article 4(2)(i) of the Treaty shall
be amended to read: "A kidnapping, murder,
or other assault against the life or physical
integrity of a person to whom a Contracting
Party has the duty according to international
law to give special protection, or any attempt
or conspiracy to commit, or being a party to

The Honourable
Henry A. Kissinger,
Secretary of State,
Washington, D.C.
20520

TIAF 8237

36

the commission of, such an offence with
respect to any such person."

(2) That clause 26 of the Schedule annexed to
the Treaty shall be amended to read:
"Offences against the laws relating to
the traffic in, production, manufacture or
importation of drugs listed in Schedule I
to the Single Convention on Narcotic Drugs
of March 30, 1961 [1] and of drugs listed in
Schedules I, II and III to the Convention
on Psychotropic Substances of February 21,
1971."

If this proposal meets with the approval of your
government, I have the further honour to propose that
this Note, which is authentic in English and in French,
and your reply shall constitute an amendment to the Treaty
on Extradition between Canada and the United States referred
to above, which shall come into force on the date of the
entry into force of the said Treaty and which shall be con-
sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest
consideration.

N. Cadieux,
Ambassador.

[1] TIAS 6298; 18 UST 1559.

39

*The Secretary of State to the Canadian Ambassador*

DEPARTMENT OF STATE
WASHINGTON

July 9, 1974

Excellency:

    I have the honor to refer to your note of
June 28, 1974, in the English and French languages,
relating to amendment of the Treaty on Extradition
between the United States of America and Canada,
signed at Washington December 3, 1971.

    On behalf of the United States of America I
confirm the understanding set forth therein and
consider that your note and this reply constitute
an agreement between the United States and Canada on
this matter.

    Accept, Excellency, the renewed assurances of
my highest consideration.

            For the Secretary of State:

           Acting Secretary

           *Joseph John Sisco*

His Excellency

    Marcel Cadieux,

        Ambassador of Canada.

# EXHIBIT 2



Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

### AMERICAN FOREIGN SERVICE

Ottawa, Canada, September 8, 2017

I, ███████eth Moore Aubin, Chargé d'Affaires of the United States of America a█ ███wa, Canada, hereby certify that the annexed papers, being authentic██ ██upporting documents proposed to be used upon an application for the extra████ from the United States of Bani SOLORZANO, who is sought in the Province ██ ██erta to stand trial for sexual interference, invitation to sexual touching ██ ██xual assault which are contrary the *Criminal Code* are properly and legal██ ██henticated so as to entitle them to be received in evidence for similar p██ ██s by the tribunals of Canada, as required by Title 18, United States Co██ ██tion 3190.

In ██ ██s whereof I hereunto sign my name and cause my seal of office to be affixe█ ██ 8th day of September, 2017.



Elizabeth Moore Aubin
Chargé d'Affaires of the
United States of America

Department of Justice
Canada

Ministère de la Justice
Canada

Ottawa, Canada
K1A 0H8

## CERTIFICATE OF AUTHENTICATION

*IN THE MATTER OF the extradition of* **Bani SOLORZANO** *from the
United States of America to Alberta, Canada*

I, ANNIE LAPERLE, Counsel for the International Assistance Group, Department of
Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation presented by
Canada in support of the extradition of ***BANI SOLORZANO*** who is sought in the
Province of Alberta to stand trial for sexual interference, invitation to sexual
touching and sexual assault which are offences contrary of the *Criminal Code.*

THAT the documentation attached to this certificate is composed of:

- the original Affidavit of Matthew W. Griener, Crown Counsel for the Ministry
  of the Attorney General for the Province of Alberta, sworn on August 11,
  2017;

- the original Affidavit of Manuel Illner, Detective, Edmonton Police Service,
  sworn on August 10, 2017.

THAT Chantelle R. Washenfelder whose original signature appears at the end of the
Affidavit of Matthew W. Griener is a Barrister and Solicitor and Commissioner of
Oaths in and for the Province of Alberta, having been duly commissioned and duly
authorized by the laws thereof to administer oaths and to take affidavits within the
said Province.

THAT Kurtis Hauptman whose original signature appears at the end of the Affidavit
of Manuel Illner is a Commissioner of Oaths in and for the Province of Alberta,
having been duly commissioned and duly authorized by the laws thereof to
administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 8th day of
September, 2017.

Annie Laperle

Canada

| | | |
|---|---|---|
| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF ALBERTA | ) | v. |
| | ) | |
| CITY OF EDMONTON | ) | BANI SOLORZANO |

In the matter of a request by Canada for the Extradition of
Bani SOLORZANO from the United States of America
With respect to offences under the *Criminal Code*

---

### AFFIDAVIT - MATTHEW W GRIENER

---

I, Matthew W Griener, of the City of Edmonton, in the Province of Alberta, Canada,

AFFIRM AND SAY THAT:

A.   QUALIFICATIONS

1.   I am a citizen of Canada and a resident of the City of Edmonton, in the Province of Alberta, Canada.

2.   I received a Bachelor of Laws degree from the University of Alberta in June, 2012 and was called to the Bar of the Province of Alberta in 2014. From that time until the present, I have been a member in good standing of the Law Society of Alberta and as such, I am entitled to practice law and have practiced law as a barrister and solicitor in the Province of Alberta.

3.   From January 2015 until the present time, I have practiced law in the employment of the Attorney General for the Province of Alberta, with the Alberta Crown Prosecution Service ("ACPS"). During that period, I have held the position of counsel with Edmonton Prosecutions, a division of ACPS, located at 6th Floor, Brownlee Building, 10365 – 97th St NW, Edmonton, Alberta, Canada.

4.     The Alberta Crown Prosecution Service (" ACPS") is a branch of the Criminal Division of the Ministry of the Attorney General. At present it is staffed by approximately 330 lawyers, all of whom specialize in criminal law. The responsibilities of counsel with the ACPS include representing the Crown in all criminal prosecutions and appeals for the Province of Alberta before all levels of criminal court including the Alberta Court of Appeal and the Supreme Court of Canada.

5.     ACPS has been directed to exercise responsibility on behalf of the Attorney General of Alberta with respect to applications by the Attorney General of Alberta for the extradition to Canada from foreign jurisdictions of persons charged in Alberta with offences contrary to the Criminal Code. Extradition in Canada is governed by the *Extradition Act*, S.C. 1999, c. C-18.

6.     From 2015 to the present time, I have represented the Crown on various motions, applications, preliminary inquiries and trials on numerous occasions, at various levels of court including the Provincial Court of Alberta (Criminal Division) and the Court of Queen's Bench of Alberta.

7.     As a result of my training and experience, I am knowledgeable about criminal procedure and jurisprudence arising from both the *Criminal Code*, R.S.C. 1985, c. C-46, and the common law in Canada.

**B.     HISTORY OF THIS EXTRADITION REQUEST**

8.     Canada is seeking the extradition of the accused Bani SOLORZANO (hereinafter "SOLORZANO") on the charges of:

> (a)  sexual interference, contrary to s. 151 of the *Criminal Code*;
>
> (b)  invitation to sexual touching, contrary to s. 152 of the *Criminal Code*;
>
> (c)  sexual assault, contrary to s. 271 of the *Criminal Code*;

9.     Under Canadian law, a person is formally charged with a crime when an Information is sworn before a justice (i.e. a Justice of the Provincial Court or a Justice of the Peace).  The charge is formally instituted when a person, usually a peace officer, swears under oath that he or she

has reasonable and probable grounds to believe that an accused has committed the offences detailed in the Information. Following the laying of an Information, a warrant for the arrest of the accused person may be issued where the Justice considers that a case for doing so is made out.

10.      In the present case, the charges were laid against SOLORZANO by the swearing of Information No. 120246186P1 by Detective Bradley James Kline, Reg. No. 1940, of the Edmonton Police Service before Ian Zaharko, Justice of the Peace, at Edmonton, Alberta on March 1st, 2012. Attached hereto as **Exhibit "A"** is a copy of the Information.

11.      Justice of the Peace Ian Zaharko also issued an Arrest Warrant on these charges on March 1st, 2012. Attached hereto as **Exhibit "B"** is a copy of the Warrant for the Arrest of Bani SOLORZANO with a date of birth of February 24th, 1988. This Warrant is of full force and effect in Alberta, Canada.

12.      I have carefully reviewed the Statement of Facts of Detective Illner, which accompanies this request, and the information therein identifying SOLORZANO as the suspect. I am familiar with the summary of the allegations and the police investigation that has taken place in this case. Based on the Statement of Facts and these documents, I verily believe that SOLORZANO is charged with sexual interference, invitation to sexual touching, and sexual assault. I have been informed and I believe that SOLORZANO has not yet been arrested in Canada in relation to these charges.

## C.      OVERVIEW OF CANADIAN CRIMINAL LAW

13.      The *Criminal Code*, Revised Statutes of Canada, 1985, Chapter C-46, as amended, is a statute enacted by the Parliament of Canada. It contains the law relating to criminal offences for the whole of Canada. It therefore applies to Alberta. The *Criminal Code* sets out definitions of offences, the maximum sentences possible for those offences, and sometimes also a minimum sentence that must be imposed for the offence.

14.      Under Canadian law, criminal offences are divided into three categories:

       (a) indictable offences;

(b) summary conviction offences; and

(c) offences that are, at the election of the prosecution, either indictable or summary conviction (referred to as "Crown-election" or "hybrid" offences).

15.    Canadian law has abolished the common law distinction between felonies and misdemeanours; however, indictable offences are roughly equivalent to felonies, and summary conviction offences are roughly equivalent to misdemeanours. Generally speaking, indictable offences are more serious, provide an accused with more elaborate procedures and safeguards and carry the risk of more severe penalties. There are no limitation periods for indictable offences. Summary conviction offences are usually less serious offences with less severe consequences upon conviction. Summary conviction offences must be instituted within six months of the offence date, unless an accused waives the limitation period. In the case of Crown-election or hybrid offences, all such offences are deemed to be indictable offences unless and until the Crown elects to proceed by way of summary conviction.

16.    The *Criminal Code* contains provisions that codify the offences with which SOLORZANO has been charged. Those provisions, as duly enacted and proclaimed in force, such that they would be applicable in the event of at trial for these offences, are set out below.

### i. Sexual Interference

17.    SOLORZANO has been charged with one count of sexual interference, a hybrid offence prohibited by section 151 of the *Criminal Code*. Where the prosecution proceeds by indictment, the accused is liable to imprisonment for up to ten years.[1] The applicable section of the *Criminal Code* is set out as follows:

---

[1] The sentence for sexual interference was raised to a maximum of fourteen years' imprisonment and a minimum of one year's imprisonment by the *Tougher Penalties for Child Predators Act*, S.C. 2015, c. 23. However, section 11(i) of the *Canadian Charter of Rights and Freedoms*, Part 1 of the *Constitution Act, 1982*, provides that "Any person charged with an offence has the right ... (i) if found guilty of the offence and if the punishment for the offence has been varied between the time of commission and the time of sentencing, to the benefit of the lesser punishment." Accordingly, SOLORZANO would be liable to a maximum sentence of ten years and a minimum sentence of forty-five days.

151. Every person who, for a sexual purpose, touches, directly or indirectly, with a part of the body or with an object, any part of the body of a person under the age of 16 years

(a) is guilty of an indictable offence and is liable to imprisonment for a term not exceeding ten years and to a minimum punishment of imprisonment for a term of forty-five days; or

(b) is guilty of an offence punishable on summary conviction and is liable to for a term not exceeding eighteen months and to a minimum punishment of imprisonment for a term of fourteen days.

18.      In order to prove this offence, the prosecution must establish (i) a touching (direct or indirect) of the complainant's body with a part of the accused's body or an object; (ii) for a sexual purpose; (iii) when the complainant was under sixteen years of age. Section 150.1(1) of the *Criminal Code* provides that consent is not a defence to a charge under sections 151 or 152, or to a charge under section 271 where the victim is under the age of 16 years. The relevant provisions of section 150.1 read as follows:

**150.1(1) Consent no defence**

Subject to subsections (2) to (2.2), when an accused is charged with an offence under section 151 or 152 or subsection 153(1), 160(3) or 173(2) or is charged with an offence under section 271, 272 or 273 in respect of a complainant under the age of 16 years, it is not a defence that the complainant consented to the activity that forms the subject-matter of the charge.

**150.1(4) Mistake of age**

It is not a defence to a charge under section 151 or 152, subsection 160(3) or 173(2), or section 271, 272 or 273 that the accused believed that the complainant was 16 years of age or more at the time the offence is alleged to have been committed unless the accused took all reasonable steps to ascertain the age of the complainant.

**150.1(6) Mistake of age**

An accused cannot raise a mistaken belief in the age of the complainant in order to invoke a defence under subsection (2) or (2.1) unless the accused took all reasonable steps to ascertain the age of the complainant.

### ii. Invitation to Sexual Touching

19.     SOLORZANO has been charged with one count of invitation to sexual touching, a hybrid offence prohibited by section 151 of the *Criminal Code*. Where the prosecution proceeds by indictment, the accused is liable to imprisonment for up to ten years. The applicable section of the *Criminal Code* is set out as follows:

> 152. Every person who, for a sexual purpose, invites, counsels or incites a person under the age of 16 years to touch, directly or indirectly, with a part of the body or with an object, the body of any person, including the body of the person who so invites, counsels or incites and the body of the person under the age of 16 years,
>
> (a) is guilty of an indictable offence and is liable to imprisonment for a term not exceeding ten years and to a minimum punishment of imprisonment for a term of forty-five days; or
>
> (b) is guilty of an offence punishable on summary conviction and is liable to imprisonment for a term not exceeding eighteen months and to a minimum punishment of imprisonment for a term of fourteen days.

In order to prove this offence, the prosecution must establish (i) that the accused invited the complainant to touch the body of the accused or any other person (including the complainant); (ii) that the accused invited the complainant to use a part of the complainant's body, or an object to accomplish this touching; (iii) that the invitation was for a sexual purpose; and (iv) that the complainant was under sixteen at the time of the offence.  As with section 151, consent is no defence pursuant to s. 150.1 (reproduced above).

### iii. Sexual assault

20.     SOLORZANO is further charged with sexual assault, contrary to s. 271 of the *Criminal Code*. The offence and penalty are reproduced below:

> 271. Everyone who commits a sexual assault is guilty of
>
> (a) an indictable offence and is liable to imprisonment for a term not exceeding 10 years; or
>
> (b) an offence punishable on summary conviction and liable to imprisonment for a term not exceeding eighteen months.

21.     Sexual assault is a form of assault. Section 265 of the *Criminal Code* defines an assault as follows:

265(1) A person commits an assault when

(a) without the consent of another person, he applies force intentionally to that other person, directly or indirectly;

[...]

265(2) This section applies to all forms of assault, including sexual assault, sexual assault with a weapon, threats to a third party or causing bodily harm and aggravated sexual assault.

22.     In order to prove this offence, the prosecution must establish (i) an intentional application of force (including any degree of touching); (ii) without consent; (iii) in circumstances such that the sexual integrity of the victim was violated. Section 150.1(1) of the *Criminal Code* also provides that consent is not a defence to a charge under section 271 where the victim is under the age of 16 years.

F.      NO LIMITATION PERIOD IN THIS CASE

23.     In Canada, there is no statutory limitation period of general application in respect of indictable offences. As such, apart from certain statutory time limitations relating to specific indictable offences which are not relevant here, the initiation of a prosecution of an indictable offence is not barred by the passage of any period of time.

G.      OPINION

24.     In Canada in order to find an accused guilty of an offence contrary to the *Criminal Code*, the trier of fact must be satisfied that the guilt of the accused has been established beyond a reasonable doubt.

25.     I have carefully read and reviewed the charging document and arrest warrant issued in respect of these charges. I have also reviewed the Affidavit of Detective Illner who is a detective in the Child Protection Section of the Edmonton Police Service and reviewed the files of the lead investigator, Detective Shannon Dechamplain (Regimental Badge Number 1860), pertaining to this matter.

26.     In my opinion, the evidence disclosed by the Affidavit of Detective Illner makes out a *prima facie* case of the guilt of SOLORZANO. That is to say, a reasonable jury properly instructed

in the law, could on that evidence find beyond a reasonable doubt that SOLORZANO is guilty of sexual interference, invitation to sexual touching, and sexual assault. I am also of the opinion that these offences are properly triable in the Province of Alberta, and that the criminal courts in the Province of Alberta have jurisdiction to try SOLORZANO.

27.     More specifically, the evidence will show that SOLORZANO touched E.S.'s vagina on multiple occasions with his hand, and caused her to touch his penis with her hand. Further, the evidence will show that SOLORZANO on one occasion put his penis in E.S.'s vagina. At the time of these offences, E.S. was 11 years old. This evidence is sufficient to establish the offences of sexual interference, invitation to sexual touching, and sexual assault.

28.     The offences for which SOLORZANO has been charged are not political offences or offences of a political character. The Canadian offences were not charged for the purpose of prosecuting SOLORZANO on account of his race, tribe, religion, nationality, sex or political opinion. If returned to Canada, SOLORZANO will have the benefit of procedural safeguards to ensure that he will not be prejudiced by reason of his race, tribe, religion, nationality, sex or political opinion.

29.     Extradition is sought and, if successful, the Crown will proceed with the prosecution of SOLORZANO for the aforementioned criminal offences.

30.     This affidavit is made in good faith in support of a request by Canada for the extradition of SOLORZANO for the aforementioned criminal offences, and for no improper purpose.

AFFIRMED BEFORE ME at Edmonton, Alberta,
this 11th day of August, 2017.

_____

(Commissioner for Oaths in and for the Province
of Alberta)

Chantelle Washenfelder

PRINT NAME AND EXPIRY

CHANTELLE R. WASHENFELDER
Barrister & Solicitor

_____

(Signature)

Matthew W Griener
Crown Prosecutor



CANADA
PROVINCE OF ALBERTA
PROVINCE D'ALBERTA

FILE NO. 120246186P1
POLICE EPS   #

INFORMATION
ON BEHALF OF HER MAJESTY THE QUEEN

DENONCIATION
AU NOM DE SA MAJESTE LA REINE

THIS IS THE INFORMATION OF                    LES PRESENTES CONSTITUENT

BRADLEY JAMES KLINE          , A PEACE OFFICER
OF EDMONTON                    , ALBERTA,

HEREINAFTER CALLED THE INFORMANT          CI-APRES APPELE LE DENONCIATEUR

THE INFORMANT SAYS THAT HE HAS        LE DENONCIATEUR DECLARE QU'IL A
REASONABLE GROUNDS TO BELIEVE         DES MOTIFS RAISONNABLES
AND DOES BELIEVE THAT:                DE CROIRE ET QU'IL CROIT QUE:

01   BANI SOLORZANO (DOB 1988 ███████ ) OF ███████ PALMDALE, CALIFORNIA, US

COUNT   1: BETWEEN THE 20TH DAY OF JUNE, 2010, AND THE 31ST DAY OF
OCTOBER, 2010, BOTH DATES INCLUSIVE, AT OR NEAR EDMONTON, ALBERTA,
DID, FOR A SEXUAL PURPOSE, UNLAWFULLY TOUCH, DIRECTLY OR INDIRECTLY,
WITH A PART OF THE BODY OR WITH AN OBJECT, A PART OF THE BODY OF
E████ S███████ A PERSON UNDER THE AGE OF SIXTEEN YEARS, CONTRARY TO
SECTION 151 OF THE CRIMINAL CODE OF CANADA.

                                                                    (S 1)

COUNT   2: BETWEEN THE 20TH DAY OF JUNE, 2010, AND THE 31ST DAY OF
OCTOBER, 2010, BOTH DATES INCLUSIVE, AT OR NEAR EDMONTON, ALBERTA,
DID, FOR A SEXUAL PURPOSE, UNLAWFULLY INVITE, COUNSEL OR INCITE E████
S███████ A PERSON UNDER THE AGE OF SIXTEEN YEARS TO TOUCH, DIRECTLY
OR INDIRECTLY, WITH A PART OF THE BODY OR WITH AN OBJECT, THE BODY OF
BANI SOLORZANO, CONTRARY TO SECTION 152 OF THE CRIMINAL CODE OF
CANADA.

                                                                    (S 1)

COUNT   3: BETWEEN THE 20TH DAY OF JUNE, 2010, AND THE 31ST DAY OF
OCTOBER, 2010, BOTH DATES INCLUSIVE, AT OR NEAR EDMONTON, ALBERTA,
DID UNLAWFULLY COMMIT A SEXUAL ASSAULT UPON E████ S███████ CONTRARY
TO SECTION 271 OF THE CRIMINAL CODE OF CANADA.

                                                                    (S 1)

SWORN BEFORE ME THIS
ASSERMENTE DEVANT MOI

14 DAY OF ~~FEBRUARY~~ March, 2012,
AT EDMONTON, ALBERTA

                    IAN ZAHARKO
                    Justice of the Peace

JUSTICE OF THE PEACE                    SIGNATURE OF              SIGNATURE DU
JUGE DE PAIX                            INFORMANT                 DENONCIATEUR

ACCUSED                        ENDORSEMENTS
ALL WARRANT: FEBRUARY 29, 2012, EDM #265    09:00        ID: C013798331

This is Exhibit " A " referred to in the          ( CROWN ELECTION          )
                  Affidavit of
Matthew Griener                                   ( SUMMARY (_) INDICTMENT (_) )

Sworn before me this  11th       day               ( DATE
of  August            A.D., 2017

A Commissioner for Oaths in and for
the Province of Alberta

CHANTELLE R. WASHENFELDER
Barrister & Solicitor

Warrant (SOLORZANO, BANI)

W A R R A N T   F O R   A R R E S T
M a n d a t   d ' a r r e s t a t i o n

AG 421
REV 02/89
CRIMINAL CODE FORM 7
Code criminel formule 7

CANADA
PROVINCE OF ALBERTA/Province d'Alberta          11-35438
POLICE FILE NO/No du dossier de police:          FILE-TE NO/No de dossier: 120246186P1-01-001
ENFORCEMENT AGENCY/Organisme chargé de l'application de la loi: EPS

PAGE 01

TO THE PEACE OFFICERS IN THE SAID PROVINCE:          Aux agents de la paix de ladite province:

THIS WARRANT IS ISSUED FOR THE ARREST OF          Le présent mandat est décerné pour l'arrestation de

*SOLORZANO* BANI          SEX/sexe: M

DATE OF BIRTH/Date de naissance: 1988

OF/de          PALMDALE
          CALIFORNIA
          US

HEREINAFTER CALLED THE ACCUSED.          ci-après appelé le prévenu

This is Exhibit " B " referred to in the
Affidavit of
Matthew Griner
Sworn before me this 11th day
ATTENDU QUE le prévenu a été inculpé of May A.D. 2017
of _____

_____
A Commissioner for Oaths in and for
the Province of Alberta

ITELLE R. WASHENFELDER
Barrister & Solicitor

WHEREAS THE ACCUSED HAS BEEN CHARGED THAT

BETWEEN THE 20TH DAY OF JUNE, 2010, AND THE 31ST DAY OF OCTOBER, 2010,
BOTH DATES INCLUSIVE, AT OR NEAR EDMONTON, ALBERTA, DID, FOR A SEXUAL
PURPOSE, UNLAWFULLY TOUCH, DIRECTLY OR INDIRECTLY, WITH A PART OF THE
BODY OR WITH AN OBJECT, A PART OF THE BODY OF [REDACTED] A PERSON
UNDER THE AGE OF SIXTEEN YEARS, CONTRARY TO SECTION 151 OF THE CRIMINAL
CODE OF CANADA.

**** ADDITIONAL CHARGES ****

120246186P1-01-002 - 152 CC  BETWEEN JUNE 20, 2010 AND OCTOBER 31, 2010          EPS   11-35438
AT EDMONTON
120246186P1-01-003 - 271 CC  BETWEEN JUNE 20, 2010 AND OCTOBER 31, 2010          EPS   11-35438
AT EDMONTON

AND WHEREAS:          ET ATTENDU:

There are reasonable grounds to believe that it is          qu'il y a des motifs raisonnables de croire qu'il est
necessary in the public interest to issue this Warrant          nécessaire dans l'intérêt public de décerner le présent
for the Arrest of the Accused.  [S07(4); 512(1)]          mandat pour l'arrestation du prévenu.  [507(4); 512(1)]

THIS IS, THEREFORE, TO COMMAND YOU, IN HER MAJESTY'S NAME,          À CES CAUSES, LES PRÉSENTES ONT POUR OBJET DE VOUS
FORTHWITH TO ARREST THE SAID ACCUSED AND TO BRING HIM          ENJOINDRE, au nom de Sa Majesté, d'arrêter immédiatement
BEFORE          ledit prévenu et de l'amener devant
ME OR ANY OTHER JUSTICE OF THE PEACE IN AND FOR THE PROVINCE OF ALBERTA,

TO BE DEALT WITH ACCORDING TO LAW.          pour qu'il soit traité selon la loi.

TERMS AND CONDITIONS IF ANY:
Modalités:

DATED THIS/Fait le 1ST DAY OF MARCH, 2012     AT/à EDMONTON
IN THE PROVINCE OF ALBERTA.          dans la province d'Alberta.

ISSUED BY: IAN ZAHARKO          IAN ZAHARKO
          Justice of the Peace

          PROVINCIAL JUDGE OR JUSTICE, REGISTRAR, CLERK OF THE COURT
          Juge provincial ou juge de paix, registraire, greffier du tribunal

CANADA          E N D O R S E M E N T   O F   W A R R A N T          FORM 29          Formule 29
PROVINCE OF ALBERTA          V i s a   d u   m a n d a t          CRIMINAL CODE          Code criminel
Province d'Alberta                    SECTION 499 and          Article 499 et
                    SUBSECTION 507(6)          Paragraphe 507(6)

WHEREAS THIS WARRANT IS ISSUED UNDER SECTION 507, 508 OR          ATTENDU QUE le présent mandat est décerné en vertu des
512 OF THE CRIMINAL CODE IN RESPECT OF AN OFFENCE OTHER          articles 507, 508 ou 512 du code criminel, relativement à
THAN AN OFFENCE MENTIONED IN SECTION 522 OF THE CRIMINAL          une infraction autre que celle visée à l'article 522,
CODE, I HEREBY AUTHORIZE THE RELEASE OF THE ACCUSED          j'autorise par les présentes la mise en liberté du prévenu
PURSUANT TO SECTION 499 OF THAT ACT.          en application de l'article 499 de cette loi.

DATED THIS/Fait le 1ST DAY OF MARCH, 2012     AT/à EDMONTON
IN THE PROVINCE OF ALBERTA.          dans la province d'Alberta.

          CLERK OF THE COURT FOR THE JUSTICE OF THE PEACE
          Greffier du tribunal pour le juge de paix

ORIGINATING COURT:
EDMONTON PROVINCIAL COURT
LAW COURTS BUILDING
1A SIR WINSTON CHURCH.SQ
EDMONTON, ALBERTA
T5J-0R2

WARRANT EXECUTED THIS _____ DAY OF _____, _____    TIME _____  PLACE _____

_____
PEACE OFFICER

***************************************END OF DOCUMENT***************************************

CANADA                          )          HER MAJESTY THE QUEEN
                                )
PROVINCE OF ALBERTA             )                   v.
                                )
CITY OF EDMONTON                )             BANI SOLORZANO


In the matter of a request by Canada for the Extradition of
Bani SOLORZANO from the United States of America
With respect to offences under the *Criminal Code*

---

**AFFIDAVIT – MANUEL ILLNER**

---


     I, Manuel Illner, of the City of Edmonton, Province of Alberta, affirm and say as follows:

## INTRODUCTION

1. I am a police officer with the Edmonton Police Service and hold the rank of Detective. I have been employed with the Edmonton Police Service since July 2008 and am currently assigned to the Child Protection Section within the Serious Crimes Branch of the Criminal Investigations Division.

2. Although not the primary investigator in this matter, I have reviewed all of the files in the possession of the Edmonton Police Service associated to it and, as such, have knowledge of these investigations and their findings. I base my grounds for belief on information I have collected personally, as well as through the collection of evidence by other police members and from the witnesses to this crime. I believe all the details in the following affidavit to be true.

**THE CHARGES**

3.  Bani SOLORZANO (hereinafter "SOLORZANO") is charged with the following
    criminal offences:

    (a)   sexual interference, contrary to s. 151 of the *Criminal Code*;

    (b)   invitation to sexual touching, contrary to s. 152 of the *Criminal Code*; and

    (c)   sexual assault, contrary to s. 271 of the *Criminal Code*.

4.  These charges stem from a series of incidents that occurred between June and
    October, 2010, involving SOLORZANO and his female cousin, E.S., then eleven
    years old. A mandatory publication ban on E.S.'s name and identity will be applied
    for under section 486.4 of the *Criminal Code* when these charges are brought into
    court. The incidents took place in the City of Edmonton, in the Province of Alberta,
    Canada.

**SUMMARY OF INVESTIGATION AND EVIDENCE**

5.  Det. Shannon Dechamplain was the lead investigator on this file when the alleged
    offences were reported to the Edmonton Police Service. Although I am now assigned
    to this investigation, I used Det. Dechamplain's report to learn about the entirety of
    the file. The conduct with which SOLORZANO stands charged is summarized below.

6.  In June 2010, the complainant E.S., who was then eleven years old, along with her
    mother, N.S., and brothers D.S. and S.S., moved into a residence located at ▮▮▮▮
    ▮▮▮▮▮▮▮▮▮ Edmonton, Alberta. This was the residence of N.S.'s sister, Silvia
    Solorzano. Also living in the house were Silvia's husband, Mario, and their three
    sons, including SOLORZANO. SOLORZANO was 22 years old at that time.[1]

7.  On March 16, 2011, N.S. reported to police that in October 2010, she and her sister
    Silvia discovered that SOLORZANO had been sexually assaulting E.S. during the
    previous months. N.S. learned of the assaults when Silvia found E.S. trying to wash
    bloodstains from her underwear. When N.S. confronted E.S. about the underwear,

---

[1] According to Alberta motor vehicle records, SOLORZANO was born on ▮▮▮▮▮▮ 988.

E.S. disclosed that SOLORZANO had digitally penetrated her vagina, that she had masturbated his penis, and that there had been one incident of vaginal intercourse.

8.  On the same date, N.S. observed a bloodstain on SOLORZANO's bedspread. Neither the bedspread nor the stained underwear were obtained by police, and accordingly, no forensic examination of these items had been conducted.

9.  Also on that date, N.S. and Silvia confronted SOLORZANO about the sexual activity between him and E.S. When confronted, he stated, "I messed up again."

10. N.S. told police that she delayed reporting the assaults to police because she was afraid her children would be taken from her by Children's Services. This belief was based on what Silvia had told her. When N.S. learned that her children would not be taken from her, in March 2011, she reported the incident to police.

11. The information outlined above was provided by N.S. to Det. Dechamplain in a video- and audio-recorded interview on March 23, 2011.

12. A video- and audio-recorded interview with E.S. was conducted by Det. Dechamplain at the Zebra Child Protection Centre on March 23, 2011. She states that on 4-5 occasions, SOLORZANO took her hand and placed it on his penis, then had her move her hand up and down. He also put his finger in her vagina "a lot" of times. E.S. was uncertain about exact dates, but can say the sexual touching took place while she and her family were living with SOLORZANO's family. She says that the accused put his penis in her vagina on one occasion. All of the sexual touching took place in a bedroom SOLORZANO shared with his two brothers and E.S.'s two brothers. She describes the accused's bedroom as containing two bunk beds with a single mattress above and a larger mattress below. One of these lower beds was the accused's. This is where the offences took place. She says that she came into the bedroom to watch SOLORZANO playing Call of Duty on a TV and Playstation he kept there, while the other family members were in the living room watching television. She used to lie on SOLORZANO's bed and play games on his iPhone while he played. She says he came onto the bed to see what she was doing, and that is where the sexual touching began.

13. Det. Dechamplain also interviewed E.S.'s brother, D.S., at the Zebra Child Protection Centre on March 29, 2011. This interview was also video- and audio-recorded. D.S. was 14 years old at the time of the interview. D.S. states that in the fall of 2010, he and SOLORZANO were in their shared bedroom. SOLORZANO said that he had "fucked up" because of what he did to E.S. When D.S. asked what SOLORZANO meant, SOLORZANO stated "I kinda raped your sister. I wish you could punch me for what I did."

14. A medical examination was conducted on E.S. at the Child and Adolescent Protection Centre (Stollery Children's Hospital) by pediatrician Michele Harvey-Blankenship, MD, PhD, FRCPC on March 28, 2011. The examination was normal and showed "no evidence of previous penetrating trauma." Dr. Harvey-Blankenship expressed the opinion that a normal examination is not inconsistent with sexual abuse.

15. On June 10, 2011, N.S. received an email from banisolorzano@rocketmail.com with a subject line "Please read this". N.S. understood that email account was used by SOLORZANO, and she forwarded the message to Det. Dechamplain on June 15, 2011. It includes the following passage:

> … My father just told me this morning about you informing the whole family about the incident that happen [sic] last year. I'm not mad at you at all and I know I probably deserve it or I might have not, but I don't want to debate on this so I'll drop it. All I want to know is why? I know i [sic] struck you in the most delicate spot ever and there are no words that can describe it. Not a day goes by that I don't think about the pain I caused you so deeply, seriously though, bullshit to the side. I can't make you keep your mouth shut about this because it's your daughter, but I would like to ask you kindly to not talk about it to no one. This only affects you and me more and [E.S.]. I have cause [sic] enough damage and now since everyone knows, the pain will grow bigger. I know what I put you through and I'm really sorry. There are days when I just get in a mood that no one can stand me and that's because I'm thinking of the pain I caused you. If you were the type of person once can talk to freely I would, but I see I can't. [...]

16. At the time of the offences, SOLORZANO was 22 years old. E.S. was unable to consent to sexual contact with SOLORZANO because she was only 11 years old. The age of consent for sexual activity in Canada is 16 years of age.

4

17. Charges of sexual assault, sexual interference, and invitation to sexual touching were laid on March 1st, 2012 as a result of this complaint. SOLORZANO could not be located, so no arrest was made. An arrest warrant issued March 1, 2012, and remains in effect.

## IDENTIFICATION AND CURRENT LOCATION

18. The accused in this matter is Bani SOLORZANO. His date of birth is February 24, 1988. SOLORZANO is a Guatemalan national by birth. He does not have any status in Canada.

19. Attached hereto and marked as **"Exhibit A"** is a photograph of SOLORZANO. This photo was obtained from Instagram by EPS analyst Nancy Leake. I showed this photograph to E.S. on July 26, 2017, and she confirmed the person in the photograph is the person known to her as Bani SOLORZANO. E.S. is SOLORZANO's cousin. She has known him for many years and was able to positively identify the individual in the photograph as SOLORZANO.

20. In April 2017, I submitted an Interpol Red Notice for SOLORZANO. I subsequently received information from the U.S. Marshals Service, Pacific Southwest Regional Fugitive Task Force (PSWRFTF) on SOLORZANO's current whereabouts. On April 2, 2015, SOLORZANO obtained a California driver's licence (████4081) listing an address of ████████ Palmdale, CA 93550. In 2016, he was issued a notice to appear for traffic violations on two occasions. Immigration and Customs Enforcement has no record of legal entry into the United States.

5

## CONCLUSION

21. Based on the foregoing, I have reasonable and probable grounds to believe, and I do believe that SOLORZANO committed the offences of sexual assault, sexual interference, and invitation to sexual touching.

22. I make this affidavit in support of Canada's request for the extradition of SOLORZANO from the United States of America to the City of Edmonton, in the Province of Alberta, Canada, so that he may be tried for the offences with which he has been charged and for no improper purpose or motive.

AFFIRMED BEFORE ME at Edmonton, Alberta,
this **10th** day of August, 2017.

_____
(Commissioner for Oaths in and for the Province
of Alberta)
A/S/Sgt . Kurtis   Hauptman
PRINT NAME AND EXPIRY   Police Officer

_____
(Signature)

MANUEL ILLNER (Reg. No. 3009)
Edmonton Police Service

6

This is Exhibit "A" to the Affidavit of Manuel Illner

Affirmed before me __10th__ August, 2017

_____

(Commissioner for Oaths in and for the Province of Alberta)

A/s/Sgt. Kurtis Hauptman    (police officer)
PRINT NAME AND EXPIRY

